Opinion issues June 12, 2014



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

**NO. 01-12-00902-CR**
**NO. 01-12-00903-CR**

_____

**MICHAEL GREGORY PETTY, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 351st District Court**
**Harris County, Texas**
**Trial Court Case No. 1271999 & 1272000**

---

**O P I N I O N**

Following a joint trial on two separate indictments, a jury found appellant

Michael Gregory Petty guilty of two offenses of intoxication manslaughter and

further found that he had used a deadly weapon, namely, a motor vehicle, during

the commission of each offense.[1]  The jury assessed punishment at 20 years' in prison for each offense.  The State filed a motion to cumulate the sentences, and the trial court ordered the sentences to be served consecutively.[2]

Appealing each judgment of conviction, Appellant raises two identical issues in each appeal.  Appellant (1) claims that he received ineffective assistance of counsel during trial, and (2) he challenges the sufficiency of the evidence to support the court costs assessed against him by the trial court.

We affirm in each appeal.

## Background

Midday, on July 26, 2010, Appellant was speeding down Interstate 45 when he lost control of his pickup truck.  Appellant's truck collided with a pickup truck driven by Manuel Portillo in which Cristo Alfonso was a passenger.  The collision caused Portillo's truck to flip and roll a number of times.  The truck's top was flattened, and Portillo's head was pinned between the driver's door and the roof.  During the rollover, Alfonso had been ejected from the vehicle, landing in the middle of the freeway.  Both Portillo and Alfonso died as a result of the injuries each sustained in the crash.

---

[1]      *See* TEX. PENAL CODE ANN. § 49.08 (Vernon 2011).

[2]      *See* TEX. PENAL CODE ANN. § 3.03(b) (Vernon Supp. 2013).

Before the crash, other motorists had seen Appellant speeding down the freeway, traveling 80 to 90 miles per hour in a 65-mile-per-hour zone. The motorists had been alarmed by Appellant's speed and erratic driving. They saw Appellant changing lanes, zigzagging from one side of the freeway to the other, and darting between cars. When he approached slower traffic ahead of him in the far left lane, Appellant slammed on his brakes. He then shot to the right across all lanes of the freeway. Appellant lost control of his truck, and it hit the back left panel of Portillo's vehicle. The force of the collision caused Portillo's truck to flip and then roll side-over-side, coming to rest on the grassy shoulder of the freeway.

Appellant was not injured in the collision. A number of the motorists who had witnessed the crash stopped on the freeway. One of the motorists approached Appellant. He noticed that Appellant was moving and speaking slowly. Appellant was also repeating himself, saying that his accelerator had stuck.

Officer D. Egdorf, a certified drug recognition expert with the Houston Police Department, arrived at the scene to evaluate Appellant for signs of intoxication. Appellant told Officer Egdorf that he had not drunk any alcohol but stated that had taken a prescription medication, topiramate, about three hours earlier. Appellant said that he had been prescribed topiramate for his migraine headaches and had been taking the medication for a couple of weeks. He stated that he had been to the hospital the day before and had gotten a new prescription

3

for topiramate. He told the officer that the bottle of topiramate was in his truck. Appellant said that the prescription directed him to take three topiramate pills a day.

Appellant also told Officer Egdorf that the label on the prescription bottle warned not to drive while taking topiramate. Appellant said that he had taken his girlfriend to work at a nearby restaurant that morning after taking the topiramate and then waited at the restaurant until the effects of the topiramate had worn off so that he could drive. He stated that his doctor had told him that the effects should wear off after two hours. Appellant indicated that he did not feel that the topiramate affected his ability to drive.

While at the scene, Officer Egdorf administered four field sobriety tests to Appellant: the Horizontal the Gaze Nystagmus (HGN), the one-leg stand, the walk-and-turn, and the Rhomberg. Appellant's performance of the tests was recorded on the camera in Officer Egdorf's vehicle.

Officer Egdorf first administered the HGN test to Appellant. Officer Egdorf observed that Appellant displayed all "six clues" during the test. Each of Appellant's eyes showed (1) lack of smooth pursuit, (2) nystagmus or an involuntary jerking movement at maximum deviation, and (3) onset of nystagmus before forty-five degrees. This indicated to Officer Egdorf that Appellant was intoxicated.

4

Officer Egdorf then had Appellant perform the Rhomberg test in which Appellant was instructed to tilt his head back, close his eyes, and estimate thirty seconds. When Appellant indicated that 30 seconds had passed, 46 seconds had actually passed. Appellant's failure to accurately estimate 30 seconds indicated a delay in Appellant's reaction time and further indicated to Officer Egdorf that Appellant was intoxicated.

Officer Egdorf also administered the one-leg-stand test and the walk-and-turn test. Appellant displayed one clue for intoxication when he swayed during the one-leg-stand test. Appellant displayed four clues for impairment during the walk-and-turn test. He used his arms for balance, he stopped walking, he failed to walk heel to toe, and he made an improper turn. Based on Appellant's performance on the field sobriety tests, particularly the HGN test, Officer Egdorf believed Appellant to be intoxicated.

In addition to Appellant's performance on the tests, Officer Egdorf observed other behaviors by Appellant that further indicated to him that Appellant's mental faculties were impaired. Appellant interrupted Officer Egdorf while he was instructing Appellant how to perform the field sobriety tests. And Appellant had difficulty following the instructions. Appellant's statements regarding what the cause of the crash may have been continued to shift as he and Officer Egdorf spoke. Appellant told Officer Egdorf that, before the collision, a vehicle on the

5

freeway traveling in front of him was "brake checking," meaning the vehicle's driver was tapping the brakes to send a message to another driver that the other driver needed to slow down. Appellant also told the officer that his engine had been revving. He mentioned that there had been a recall by the manufacturer of his truck regarding the floor mats. Appellant also told Officer Egdorf that he had cheap tires on the truck.

Based on Appellant's performance of the field sobriety tests and his interaction with Appellant, Officer Egdorf arrested Appellant for driving while intoxicated. Officer Egdorf recovered the bottle of topiramate from Appellant's truck. The bottle indicated that the prescription had been filled the preceding day. The label indicated the prescription was for 30 pills with each pill containing 100 milligrams of topiramate. Officer Egdorf counted the pills in the bottle and found that it contained 24 pills.

Officer Egdorf also recovered from Appellant's truck the medication information sheet for the topiramate, which Appellant had received the previous day. The sheet indicated that topiramate is a prescription medication used to treat epilepsy and migraines. It also indicated that side effects for topiramate include: weakness, tiredness, drowsiness, dizziness, confusion, and difficulty concentrating. Under the heading "precautions," the sheet stated that topiramate "may make you dizzy or drowsy or cause blurred vision. Do not drive, use machinery, or do any

activity that requires alertness or clear vision until you are sure you can perform such activities safely."

Officer Egdorf transported Appellant to the hospital where a blood sample was drawn. The officer then transported Appellant to the police station. There, Officer Egdorf again administered the HGN test to Appellant. Officer Egdorf used a piece of equipment known as a HawkEye to make a close-up video recording of Appellant's eyes while the HGN test was administered. Appellant again exhibited all six clues of intoxication. In addition, Officer Egdorf observed that Appellant's eyes showed a lack of convergence when he brought a stimulus in toward Appellant's nose. This also indicated to Officer Egdorf that Appellant was intoxicated.

Appellant was charged with two offenses of intoxication manslaughter with respect to the deaths of Manuel Portillo and Cristo Alfonso. Each indictment read as follows:

> . . . MICHAEL GREGORY PETTY, . . . on or about JULY 26, 2010, did then and there unlawfully by accident and mistake while operating a motor vehicle in a public place while intoxicated and by reason of that intoxication, cause the death of [the complainant], by driving his motor vehicle into and causing it to collide with a motor vehicle occupied by the complainant.

> [A]t the time that the Defendant committed the felony offense of INTOXICATION MANSLAUGHTER on or about JULY 26, 2010, as hereinabove alleged, he used and exhibited a deadly weapon, namely, a MOTOR VEHICLE, during the commission of said offense and during the immediate flight from said offense.

7

At trial, Appellant's defense was two-fold.  Appellant asserted that he was not intoxicated at the time of the collision.  He claimed that the topiramate had not impaired his use of his mental or physical faculties.  Appellant also asserted that he was not the cause of the collision.  He claimed that there had been a mechanical problem with his truck.  Appellant asserted that either a tire had blown out or the tie rod had broken, causing him to lose control of his truck and collide with Portillo's vehicle.

The State presented numerous witnesses who had seen Appellant driving on the freeway immediately before the collision and had witnessed the collision itself. They testified regarding the great speed at which Appellant drove his truck, his erratic driving, his zigzagging between lanes, and his darting between cars.  Two witnesses testified that Appellant was driving so fast that their cars shook as Appellant sped by their vehicles.  One witness stated that, at the time, she thought Appellant was in a high-speed chase.  The witnesses indicated that the collision occurred when Appellant slammed on his brakes to avoid the vehicles in front of him, swerved to right, and lost control of his truck.  A number of the witnesses indicated that they had not noticed anything mechanically wrong with Appellant's truck, including its tires.

The State presented evidence—through the testimony of the police officers who had reconstructed the collision—that Appellant had not lost control of his

8

truck due to a blown out tire or from a broken tie rod. Following the crash, the truck was found to have a broken tie rod and a flat tire, however, the State presented evidence showing that this damage had happened as a result of the collision and was not the cause of the collision. In line with the testimony of the eye witnesses, the State's accident reconstruction expert testified that Appellant had been going at least 84 miles-an-hour.

Appellant's then-girlfriend, Kristen, testified that she and Appellant had gone to the emergency room the day before the crash because Appellant had a migraine headache. She stated that Appellant was released that same night around 8:00 or 9:00 p.m. Appellant filled his prescription at the pharmacy that night, but Kristen did not see him take the medication that night or the next morning. Kristen testified that Appellant had gone to the hospital a number of other times earlier in the month for his migraines.

Kristen also stated that, on the morning of the crash, Appellant had driven her to the restaurant where she worked. Appellant told her that he had taken a stool softener prescribed by the doctor the previous day. Appellant stayed at the restaurant for an hour or hour-and-one-half until the stool softener worked. Kristen testified that when he left the restaurant, Appellant looked "normal" to her.

Immediately after the crash, Appellant called Kristen on his cell phone. The restaurant was close to where the crash had occurred, and Kristen went to the

scene. She stated that she was able to talk to Appellant for a few minutes before he was placed in a patrol car. Kristen stated that Appellant appeared shaken and nervous but did not seem intoxicated.

Officer Egdorf also testified at trial. He described his interaction with Appellant at the scene, including Appellant's repeated acknowledgment that he was aware that the topiramate warning label had an instruction not to drive after taking topiramate. Officer Egdorf testified that topiramate is a central nervous system depressant similar to alcohol. Officer Egdorf also described the field-sobriety tests he had administered to Appellant and explained how Appellant's performance of the tests further indicated that he was intoxicated.

With regard to the HGN test, Officer Egdorf explained that nystagmus is the involuntary jerking of the eye caused by a central nervous system depressant, such as alcohol or topiramate. Officer Egdorf testified that the nystagmus can affect a driver's vision. Specifically, nystagmus may affect a driver's ability to see out of a vehicle's side and rear view mirrors and could affect a driver's peripheral vision.

The video taken by Officer Egdorf's in-car camera at the scene was admitted into evidence during the officer's testimony. The video showed Appellant's performance of the field sobriety tests, and it captured Appellant's interaction with Officer Egdorf. When asked, Officer Egdorf agreed that Appellant had been cooperative during the scene investigation. He also acknowledged that Appellant

10

was not slurring his speech or stumbling. Aside from the HGN test, Officer Egdorf agreed that Appellant had correctly performed portions of the field-sobriety tests. He also agreed that, to the "average person," Appellant may not have appeared intoxicated.

The Hawk Eye video showing a close up of Appellant's eyes during the administration of the HGN test was also admitted into evidence. As the video was played for the jury, Officer Egdorf pointed out the jerking of Appellant's eyes, or nystagmus, seen in the video.

Officer Egdorf acknowledged that much of his testimony offered to support his determination that Appellant was intoxicated related to Appellant's performance on the HGN test. However, when asked to explain the basis for his belief that Appellant had lost the use of his physical faculties, Officer Egdorf responded, "We see that with the HGN tests, with the muscle control in his eyes. You see it on the physical test, the divided-attention test, with the clues that you see on the one-leg stand test, the Rhomberg balance test, the four clues that we see on the walk-and-turn test."

When asked to support his opinion that Appellant had lost the use of his mental faculties, Officer Egdorf responded: "I think you hear in the video with his repetitive speech, his story changing, he's not able to follow all the instructions that I gave him. He keeps interrupting as I'm trying to give instructions."

11

The State also offered the testimony of Dr. Jeff Walterschied, assistant chief toxicologist at the Harris County Institute of Forensic Sciences. Dr. Walterschied testified that topiramate is a central nervous system depressant. He stated that alcohol is also a central nervous system depressant. He explained that a central nervous system depressant affects the central nervous system by slowing neural firing; it causes drowsiness and loss of coordination.

Dr. Walterschied said that topiramate is mainly used to treat epilepsy but can also be used to treat migraines when other treatments have failed. Dr. Walterschied provided the following testimony regarding the effects of taking topiramate:

> Q. Now, when someone takes Topiramate or [the brand name] Topamax, what kinds of effects will it have on the body?
>
> A. It can cause dizziness, drowsiness, loss of coordination, slurred speech. One of the most notable effects that's been found is cognitive impairment or clouded judgment.
>
> Q. What does cognitive impairment mean?
>
> A. It's the inability to, say, remember and recall memories, information, making judgments. Quick decisions are impaired.
>
> Q. How does this impact someone's driving abilities?
>
> A. Adversely.
>
> Q. In what ways?
>
> A. In the safe operation of a vehicle, you have to keep track of a number of things; time and speed, distance relative to other cars,

12

keeping track of many different things. And whenever those—under the influence of an intoxicating drug, the ability to keep track of positions of cars and of rate and speed and coordination are all impaired.

Q. Now, is that true of someone that is taking a prescribed dose? Can they still be affected and have cognitive impairment on Topiramate?

A. It can, yes.

Dr. Walterscheid testified that Appellant's blood contained 13 milligrams per liter (13mg/L) of topiramate. Dr. Walterscheid stated that this amount was much higher than expected under normal treatment for epilepsy or for migraines. He testified that a typical therapeutic dose of topiramate was four to five milligrams. He explained that a "[t]herapeutic dose would be the amount needed to achieve therapeutic resolution, but not too excessive to cause adverse effects."

With regard to the level of topiramate found in Appellant's blood, the following exchange occurred:

Q. So, typically, a therapeutic dose would be—what number would you be looking at?
A. Around 4 to 5 milligrams per liter.

Q. The 13 milligrams per liter, how much Topiramate would it take to get to this level?

A. About 5 to 600 milligrams.

Q. Now, is that 5 to 600 milligrams taken all at one time?

A. In a short interval.

13

Q. What does a short interval mean?

A. Maybe within five to ten hours.

Q. So, if someone had a prescription filled, let's say, at about 10:00 p.m. for 30 hundred-milligram tablets of Topiramate and the next morning, around 12:30, it was discovered that six of those pills were missing, would that be consistent with the levels of Topiramate that were determined to be in the defendant's body?

A. Yes.

Q. So, six 100-milligram tablets is how much Topiramate?

A. Six hundred.

Q. Six hundred milligrams.

. . . .

Q. Now, the level of 13 milligrams per liter, is that a therapeutic dose?

A. It exceeds what would be a normal therapeutic level.

Q. What—would that be an intoxicating amount?

A. Yes.

Dr. Walterschied also explained the meaning of a drug's half-life. He stated, "Half-life is a concentration-dependent process of elimination in the body for certain drugs. And in this case, Topiramate has a half-life of around 20 hours. So, every 20 hours it goes by half and then half and then half of the original amount is left." When asked how long a 100-milligram pill of topiramate would remain in a

14

person's body he stated, "[A]ny drug will persist about six to seven half-lives. So, that would be 140 hours . . . ."

Dr. Walterschied also testified regarding nystagmus. He stated,

Nystagmus is a natural mechanism the body uses to track objects as they're passing, especially in peripheral vision. And so, you're—whenever you're in traffic or let's say you're stationary watching a car go by, you're really locking on and tracking it. So, if nystagmus . . . is enhanced, affected, it's—you lack the ability to lock and track. And it's more of . . . a wavering, so kind of a blurry, double-vision sort of effect.

At the conclusion of its direct examination, the State asked: "Based on your experience and training and the results of this blood test, do you have an opinion as to whether or not the defendant was intoxicated at the time of this crash?" Dr. Walterschied responded, "Yes, this is intoxicating."

On cross-examination, defense counsel questioned Dr. Walterschied regarding his opinion that the 13 milligrams per liter of topiramate present in Appellant's blood was an intoxicating level of topiramate and not a therapeutic level. Defense counsel first got Dr. Walterschied to concede that not everyone who takes topiramate will experience its side effects:

Q. And in your testimony, it's fair to say that you cannot conclusively state what the effects of this . . . 13 milligrams per liter that [the laboratory analyst] came up with, how it would have affected Mr. Petty in this case, correct?

A. Well, based on my experience and training, it's consistent with what is found in the medical literature.

15

Q. That this particular level that you all came up with had an intoxicating effect on Michael Petty?

A. I can only say it's consistent with intoxication.

Q. Well, let me ask you this: When you talk about the side-effects of Topiramate, you'd agree with me that you cannot say that side-effects—these particular side-effects always occur, correct?

A. Not always.

. . . .

Q. In other words, there's going to be the person that doesn't experience dizziness or drowsiness, correct?

A. That can be true.

Q. Okay. There's going to be the person who doesn't have blurred vision the way it may affect other people, correct?

A. That's possible.

Q. There's going to be the person that has . . . no serious side-effects, although there may be a long listing of side-effects that may be common, correct?

A. True.

Defense counsel also questioned Dr. Walterschied regarding how he determined that 13 milligrams per liter of topiramate was an intoxicating level versus a therapeutic level:

Q. Now, you stated what you would expect for the therapeutic dose would be between 4 and 5, correct?

A. About that, yeah.

16

Q. And the number that you-all came up with is 13, correct?

A. Right.

Q. And so, at what point between therapeutic and intoxicating levels would you draw the number? Is it 6? Is 6 all of a sudden intoxicating?

A. No, . . . it's kind of a gray area. It's more of observations of—

Q. Okay. I'm sorry. I don't want to cut you off. Observations of?

A. Observations of intoxication correlating with scientific data that we have.

Q. Okay. So, observations of whom?

A. From the police reports and witnesses.

Q. And so, in order for you to then move it to an intoxicating level, you've got to rely on what the police officers put in the report, correct?

A. That's right.

Q. Because you have no—I mean, you weren't out there at the scene at any time, didn't become involved in this case until almost a year later, correct?

A. That's right.

Q. And so, you've got to depend on whatever the arresting officers or the observing officers . . . to then come in here and tell the jury whether or not you think it's therapeutic or intoxicating, correct?

A. Right.

17

Appellant testified in his own defense at trial. He stated that he had gone to the hospital the day before the crash because of a migraine headache. He testified that he was admitted as an outpatient and given Demerol intravenously for pain. Appellant stated that he was released from the hospital about 2:30 a.m. on the day of the crash with a prescription for topiramate. He said that he had already been taking topiramate for approximately two weeks. On his way home, he filled the topiramate prescription at the pharmacy. He stated that the prescription was for 30 topiramate pills with each pill containing 100 milligrams of topiramate. Appellant testified that he had taken one topiramate before he went to sleep. He woke up around 8:15 a.m. and took another topiramate. At that point, Appellant claimed that 28 topiramate pills remained in the bottle. Appellant stated that he drove his girlfriend, Kristen, to work around 9:45 a.m. He stayed at her workplace until lunchtime.

After leaving, Appellant immediately got onto Interstate 45 with his truck. He testified that he had taken a laxative that morning and, after entering the freeway, he felt that he needed to use the restroom. Appellant stated that he was traveling 70 miles an hour and changing lanes in attempt to reach his home to prevent having a bowel movement in his pants. He denied traveling at a rate of 80 to 90 miles an hour, as a number of witnesses had stated. Appellant claimed that he had not been on the freeway long when his tire blew out. He stated this caused

him to lose control of the truck, and he crash into Portillo's vehicle. Appellant testified that the topiramate had not affected his physical or mental faculties on the day of the crash. In other words, he denied that he was intoxicated.

Following closing arguments, the jury found Appellant guilty of two offenses of intoxication manslaughter.

During the punishment phase, the jury heard that Appellant had previously been convicted of assault, burglary of a motor vehicle, and criminal mischief. Appellant had also been convicted of reckless driving in 2007 because he had been zig-zagging between lanes and driving 90 miles per hour. Appellant's driving record also showed a history of speeding tickets and getting into car accidents.

The State also presented records obtained from Appellant's cell phone. The records were from several days preceding the crash. These records included text messages between Appellant and numerous other people. The text messages reveal that Appellant was dealing marihuana on the day of the crash. In one message, sent the morning of the crash, Appellant told a friend that he was required to take a drug class because he had failed a drug test at work. He stated that he had to start selling drugs to make ends meet.

A photograph recovered from Appellant's phone was also admitted into evidence. It shows Appellant in a hospital gown smiling and flashing a gang sign.

The photograph was taken the same month as the crash, during another hospital admission.

Members of the complainants' families also testified regarding the good character of the complainants, how much the complainants were missed, and how greatly their deaths had affected the families. In addition, personal photographs of the complainants were admitted into evidence.

Appellant and his sister testified at the punishment phase. They each testified that Appellant was remorseful, and Appellant apologized to the complainants' families. Appellant also admitted that he had been selling marihuana, as indicated in the text messages. Appellant admitted to causing the crash, but he continued to deny that he was intoxicated at the time of the collision.

After hearing the evidence, the jury assessed Appellant's punishment at the maximum sentence for each offense: 20 years in prison. The trial court ordered the sentences to be served consecutively. In the judgments, the trial court ordered Appellant to pay $444.00 in court costs.

Appellant filed a motion for new trial in each case. Appellant claimed that he had received ineffective assistance of counsel at trial. He asserted that trial counsel "did not perform a scientific investigation into the issue of intoxication and did not consult or retain an expert or adequately prepare for trial." To support the motion, Appellant attached an affidavit of Ed French, who holds a Ph.D. in

pharmacology. Dr. French stated that the recommended dosage of topiramate to treat migraines is 100 milligrams divided into two 50 milligram doses. He also averred as follows:

> In my search and review of a very reliable drug compendium, I could not find anything to support a finding of blood levels and degrees of intoxication. Topiramate is primarily cleared through the kidneys. Therefore, the blood levels of topiramate could be increased if kidney function has declined (which could result in involuntary overdose). If the defense had consulted with me or any properly trained pharmacologist prior to trial, they would have been able to present this information to the jury.
>
> I have been informed that Mr. Petty's level of topiramate was 13 mg/L. This level is within the normal therapeutic range and is not indicative of intoxication. My current professional understanding is that the therapeutic range of topiramate is 2 mg/L–20 mg/L. The range in which topiramate induces intoxication has not been well-studied or established in scientific literature. Furthermore, most individuals display optimal response to topiramate with serum levels 2 mg/L–20 mg/L. Some individuals may respond well outside this range, or may display toxicity within the therapeutic range, thus interpretation should include clinical evaluation.

The State filed a response to the motion for new trial, supported by the affidavit of Dr. Walterschied, who had testified at trial. In his affidavit, Dr. Walterschied responded to the assertions made by Dr. French in his affidavit. Dr. Walterscheid agreed that the recommended dose for topiramate to treat migraines is 100 milligrams per day administered in two divided doses. However, he stated that the treatment must be administered with a four-week titration plan, meaning that the daily doses of topiramate are increased from 25 milligrams taken in the

21

evening for the first week followed by an incremental increase into the fourth week of therapy to 100 milligrams per day.

Dr. Walterschied stated that the dosage that Appellant claimed to have taken before the crash was not large enough to explain a 13mg/L level of topiramate in his blood. Dr. Walterscheid acknowledged that poor kidney function would be a significant factor if the dosing of topiramate had occurred over several days, but he indicated in his affidavit that was not what had occurred in this case. Dr. Walterschied stated that the therapeutic range for topiramate of 2 mg/L to 20 mg/L, reflected in the medical literature, applied to the prevention of epilepsy rather than to the treatment of migraines. He also stated that "it is important to recognize that a therapeutic dose can still overlap with impairment. Patients who require larger doses to prevent onset of seizures are advised to not perform safety-critical tasks such as driving, particularly during the initial titration phase of therapy."

In his affidavit, Dr. Walterscheid set out, explained, and then applied, the mathematical formula he used to determine the amount of topiramate in Appellant's blood. He stated that this amount was consistent with the theory that Appellant had taken 600 milligrams of topiramate. Dr. Walterschied averred that this "supports the assertion that the missing 600mg tablets from the topiramate prescription bottle were ingested by the defendant."

22

In response to Dr. Walterscheid's affidavit, Appellant offered the affidavit of Thomas Kosten, a medical doctor board certified in neurology and psychiatry. He averred that, although topiramate is a sedative like alcohol, it "does not make you feel high or euphoric." He stated that topiramate is "often considered unpleasant by patients," particularly at the dosage level prescribed to Appellant. According to Dr. Kosten, ingesting 600 milligrams of topiramate at one time would likely make a person nauseous and possibly vomit. Dr. Kosten stated that topiramate is "not considered a controlled or abused drug."

Dr. Kosten also stated that Appellant's 13 mg/L topiramate blood level was "not clinically meaningful" and did not indicate that Appellant had ingested 600 milligrams of topiramate. Dr. Kosten averred that Appellant "has mild renal impairment leading to an increase in blood levels of this medication compared to the amount [of topiramate] ingested." Dr. Kosten also stated that other factors affect the level of topiramate in a person's blood and those factors should be considered. He identified timing and amount of the last dose taken and whether the medication had been taken acutely or chronically as factors to consider. Dr. Kosten noted, "Mr. Petty was taking this medication chronically and had no history of impairment with topiramate in the past." Dr. Kosten concluded, "[F]or all of the above reasons [Dr. Walterschied's] calculation is likely to be inaccurate and a significant over-estimation of the dose being taken."

23

Dr. Kosten also addressed horizontal gaze nystagmus. He stated that nystagmus is a normal effect caused by therapeutic dosages of topiramate. He acknowledged that "[n]ystagmus is one sign of several signs to be used in a determination of intoxication." Dr. Kosten offered his opinion that the video of Appellant at the scene "showed no other evidence of intoxication or impairment."

Appellant's trial counsel, Michelle Beck, also filed an affidavit regarding her trial preparation and strategy. In her affidavit, Beck stated her investigation had included personal research and reading of numerous articles on topiramate. She also read articles from the Internet provided by Appellant. Counsel stated that she reviewed literature on the effects of topiramate in DWl cases and on its prescribed uses. Beck stated that her next step was "to investigate whether this level of Topirimate was intoxicating." She averred that she consulted with three pharmacists and the emergency room doctor, who saw Appellant, "for their professional opinions as to the intoxicating effects this amount of the drug would have on [Appellant]." Beck testified that she contacted Brandon Moody, Warren Moody, and Lance Henderson of Texas Southern University School of Pharmacy, who are each licensed pharmacist and "who have expertise in the area of toxicology and effects of drugs on the human system." She stated, "I discussed with them the findings with regard to the disclosed levels of Topiramate and was

24

informed that there is no set level of the drug which establishes intoxication."[3]

Beck testified that she "was told that these upper and lower levels for therapeutic verses intoxication limits could be manipulated based upon whomever was doing the analysis."

> Beck further stated in her affidavit as follows:
>
> Because there was no definitive conclusion in research articles as well as the expert opinions of those that I spoke with concerning established levels of intoxication with regard to this drug, I decided it was not necessary to hire an expert to testify in this matter. I determined that I would be able to get the State's expert witness with regard to toxicology to admit on cross-examination that there are no established levels of intoxication and no legal limits established with regard to Topiramate. I accomplished this with Dr. Walterschied. I used the State's own witness to make my point.
>
> I then decided to look at what signs of intoxication the defendant exhibited just after the accident which would go to loss of normal use of mental and physical faculties. After reviewing the defendant's performance at the scene and the police station, I determined that he performed pretty well. The normal signs of speech and a coherent thinking processes were present. He performed relatively well on the standardized field sobriety tests and I knew that the State would rely heavily on the HGN test which normally is not enough alone to convince a jury of intoxication. The State only had one witness, Ofc. Egdorf, who I predicted they would attempt to make their entire case of intoxication on. I made a strategical decision to base our defense on the visual evidence that the jury would be able to review with their own eyes. I also spoke with the defendant's then girlfriend Kristen [L.], to determine what, if any signs of intoxication she observed in the defendant and she stated none. I also spoke with the defendant

---

[3] Appellant submitted an affidavit from Henderson in which he stated that Beck had called him requesting information regarding topiramate to aid in Appellant's defense. Henderson stated that, after he had gathered some information, he did not receive a call back from Beck.

about his physical and mental state at the time of the accident and brought that testimony out at trial regarding his level of loss of normal use.

At a hearing on Appellant's motions for new trial, the trial court admitted the affidavits into evidence. No live testimony was presented. At the end of the hearing, the trial court denied Appellant's motions for new trial.

These appeals followed. Appellant presents the same two issues in each appeal. He asserts that he received ineffective assistance of counsel at trial and claims that the court costs reflected in the judgments are not supported by sufficient evidence.

## Ineffective Assistance of Counsel

Appellant frames his first issue as follows: "Trial counsel rendered ineffective assistance of counsel for failing to present an expert witness on topiramate and was therefore unable to offer any meaningful challenge to the findings and conclusions of the State's experts, many of which proved to be incorrect." Appellant summarized his arguments in his brief as follows:

> Despite the fact that counsel knew the State would argue that her client was intoxicated on little-known prescription medication that did not have well-accepted levels of intoxication, she failed to retain the expert assistance that was necessary in order to present a defense and counter the arguments made by the State's expert witnesses. An expert was crucial to inform the jury as to the effects of topiramate, the significance of the blood levels, especially with regard to Mr. Petty's kidney disorder, and the meaning of the HGN test.

26

. . . .

> The State's experts testified unchallenged that topiramate was an intoxicating drug similar to alcohol and that since Mr. Petty's blood levels were three times the therapeutic amount and he failed the HGN, he must have been legally intoxicated. Trial counsel was completely unable to refute these inaccurate conclusions without the assistance of an expert and was therefore ineffective in violation of [Appellant's] rights.

## A. Applicable Legal Principles

To prevail on an ineffective assistance claim, an appellant must show that (1) his counsel's representation fell below an objective standard of reasonableness and (2) the deficient performance prejudiced his defense. *See Strickland v. Washington*, 466 U.S. 668, 669, 104 S. Ct. 2052, 2055 (1984); *see also Perez v. State*, 310 S.W.3d 890, 892–93 (Tex. Crim. App. 2010). An appellant must satisfy both prongs by a preponderance of the evidence; failure to demonstrate either deficient performance or prejudice will defeat a claim of ineffectiveness. *See Perez*, 310 S.W.3d at 893.

Under the second *Strickland* prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Perez*, 310 S.W.3d at 893 (quoting *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (quoting *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068). An appellant must show more

than "that the errors had some conceivable effect on the outcome of the proceeding." *Id*. (quoting *Strickland*, 466 U.S. at 693, 104 S. Ct. at 2067). "Rather, he must show that 'there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'" *Id.* (quoting *Strickland*, 466 U.S. at 695, 104 S. Ct. at 2068–69). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *See Andrews v. State*, 159 S.W.3d 98, 102 (Tex. Crim. App. 2005).

When, as here, the prejudice prong of the *Strickland* test is dispositive, we need address only that prong on appeal. *See My Thi Tieu v. State*, 299 S.W.3d 216, 225 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd) (citing *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069). And, when, as here, the ineffective assistance claim is asserted by a defendant in a motion for new trial, and that motion is denied after an evidentiary hearing, we review the denial of the motion under an abuse of discretion standard. *See Anderson v. State*, 193 S.W.3d 34, 39 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd). We review de novo the trial court's decision on the prejudice prong while giving deference to the trial court's implied resolution of underlying factual determinations in support of the denial of the motion for new trial. *Johnson v. State*, 169 S.W.3d 223, 239 (Tex. Crim. App. 2005) (quoting *Charles v. State*, 146 S.W.3d 204, 213 (Tex. Crim. App. 2004), *superseded by* TEX. R. APP. P. 21.8(b) (amended 2007)). When no express fact findings are made

28

by the trial court, appellate courts should "impute implicit factual findings that support the trial judge's ultimate ruling on that motion when such implicit factual findings are both reasonable and supported in the record." *Id.*

## B.    Analysis

On appeal, Appellant asserts, "If counsel had acted as a reasonable attorney facing a case that hinged upon the effects of an unusual and nonscheduled medication, she would have retained an expert. An expert would have explained the effects of topiramate, the significance of the blood levels, and the meaning of the HGN test." We ask: If trial counsel had presented such evidence is there a reasonable probability that the outcome of the proceeding would have been different?

### *The HGN Evidence*

Appellant points out, "The HGN was a major point of evidence for the State." He asserts that his trial counsel was ineffective because "the jury was never informed that normal, therapeutic levels of topiramate would also cause HGN, as Dr. Kosten's affidavit asserts." However, Dr. Kosten also acknowledged in his affidavit that "the presence of nystagmus can signify some aspects of intoxication." Indeed, the Court of Criminal Appeals held in *Emerson v. State* that the HGN test is a reliable indicator of intoxication. 880 S.W.2d 759, 777 (Tex. Crim. App.

1994). Here, Officer Egdorf testified that Appellant exhibited all six clues of intoxication on the HGN test.

Appellant also criticizes trial counsel because she "did not challenge the repeated assertion that HGN equates with blurred vision and proves intoxication." In support of his criticism, Appellant cites a publication by the National Highway Traffic Safety Administration, entitled "*Horizontal Gaze Nystagmus: The Science & The Law–A Resource Guide for Judges, Prosecutors and Law Enforcement*."[4]

The publication states, "Most types of nystagmus, including HGN, are involuntary motions, meaning the person exhibiting the nystagmus cannot control it. In fact, the subject exhibiting the nystagmus is unaware that it is happening because the bouncing of the eye does not affect the subject's vision."[5] However, a footnote to the last sentence in the quote states, "There have been some studies that suggest that HGN due to alcohol impairment may affect the ability of a person to see clearly."[6] At trial, the State presented evidence that topiramate and alcohol are both classified as depressants, which affect the central nervous system. In his affidavit offered to support Appellant's motion for new trial, Dr. Kosten

---

[4] The publication *Horizontal Gaze Nystagmus: The Science & The Law–A Resource Guide for Judges, Prosecutors and Law Enforcement* is available at http://www.nhtsa.gov/people/injury/enforce/nystagmus/hgntxt.html (last visited June 8, 2014).

[5] *Id.*
[6] *Id.*

acknowledged that topiramate is a sedative like alcohol. Given the footnote and the evidence, Appellant has not shown that he would have benefitted from a challenge to the State's evidence that HGN equates with blurred vision.

In addition, it is significant that ample evidence of Appellant's intoxication, aside from the HGN evidence, was presented at trial. The jury in this case was correctly instructed, "'Intoxicated' means not having the normal use of mental or physical faculties by reason of the introduction of alcohol, a controlled substance, a drug, a dangerous drug, a combination of two or more of those substances, or any other substance into the body." *See* TEX. PENAL CODE ANN. § 49.01(2)(A) (Vernon 2011).

Numerous witnesses testified that he or she saw Appellant driving in an alarming and erratic manner at a high rate of speed. The State's accident reconstruction expert testified that Appellant was driving at least 84 miles-an-hour, while darting between cars and zigzagging between lanes. When he approached slower moving traffic, witnesses stated that Appellant had slammed on his brakes, swerved right across the freeway, lost control, and crashed into Portillo's truck. The State offered evidence showing that the crash had not been caused by a blown out tire or broken tie rod, as Appellant testified at trial.

In addition to the HGN test, Officer Egdorf testified that Appellant displayed clues of intoxication on the three other field-sobriety-tests. Significantly, on the

31

Rhomberg test, Appellant estimated the passage of 46 seconds to be the passage of 30 seconds. Officer Egdorf testified that this indicated to him a delay in Appellant's reaction time. Officer Egdorf also testified that Appellant displayed four clues for intoxication during the walk-and-turn test and one clue when he swayed during the one-leg-stand test.

Officer Egdorf further stated that he observed signs that Appellant's mental faculties were impaired. Officer Egdorf testified that Appellant continually interrupted him while he was instructing Appellant how to perform the field sobriety tests. He stated that Appellant had difficulty following those instructions. Officer Egdorf also noted that Appellant's statements regarding what may have caused the crash continued to shift as he and Appellant spoke.

The jury also heard Appellant, in the scene video, admit to Officer Egdorf that the topiramate label had a warning not to drive while taking the medication. Appellant stated that he had taken one 100 milligram topiramate after he left the hospital at 2:30 a.m. and another when he awoke at 8:15 a.m. The collision occurred at approximately at 12:30 p.m.

The drug information sheet, recovered from Appellant's truck and admitted into evidence, warned that the side effects for topiramate include: weakness, tiredness, drowsiness, dizziness, confusion, and difficulty concentrating. Under the heading "precautions," the sheet stated that topiramate "may make you dizzy or

drowsy or cause blurred vision. Do not drive, use machinery, or do any activity that requires alertness or clear vision until you are sure you can perform such activities safely."

Dr. Walterscheid also testified that topiramate can cause dizziness, drowsiness, and loss of coordination. He stated that one of the most notable effects is cognitive impairment or clouded judgment. Dr. Walterscheid explained that cognitive impairment adversely affects a person's ability to drive. He explained,

> In the safe operation of a vehicle, you have to keep track of a number of things; time and speed, distance relative to other cars, keeping track of many different things. . . . [U]nder the influence of an intoxicating drug, the ability to keep track of positions of cars and of rate and speed and coordination are all impaired.

Dr. Walterscheid testified that cognitive impairment may occur even when a person is taking a prescribed dose of topiramate.

Furthermore, the State presented evidence that the pill bottle recovered from Appellant's truck contained only 24 of the 30 prescribed pills. This was circumstantial evidence from which the jury could have inferred that Appellant had taken six pills, rather than the two pills that he claimed to have taken. Lastly, the blood test showed that Appellant had topiramate in his system. In short, there was ample evidence of Appellant's intoxication, aside from the HGN evidence. Appellant has failed to show that he was prejudiced by his trial counsel's handling of the HGN evidence.

*Topiramate Blood Levels*

Appellant also criticizes trial counsel because she did not retain an expert to refute Dr. Walterschied's testimony (1) that the therapeutic level of topiramate was not limited to 4 to 5 mg/L and (2) that Appellant's blood level of 13 mg/L exceeded a normal therapeutic level to the point it was an intoxicating level. As she stated in her affidavit, trial counsel decided not to retain an expert to show that there is no set intoxicating level of topiramate; rather, she made the strategic decision to use the State's expert, Dr. Walterscheid, to make this point.

As set out above, the following exchange occurred between trial counsel and Dr. Walterscheid during cross-examination:

> Q. Now, you stated what you would expect for the therapeutic dose would be between 4 and 5, correct?
>
> A. About that, yeah.
>
> Q. And the number that you-all came up with is 13, correct?
>
> A. Right.
>
> Q. And so, at what point between therapeutic and intoxicating levels would you draw the number? Is it 6? Is 6 all of a sudden intoxicating?
>
> A. No, . . . it's kind of a gray area. It's more of observations of—
>
> Q. Okay. I'm sorry. I don't want to cut you off. Observations of?

34

A. Observations of intoxication correlating with scientific data that we have.

Q. Okay. So, observations of whom?

A. From the police reports and witnesses.

Q. And so, in order for you to then move it to an intoxicating level, you've got to rely on what the police officers put in the report, correct?

A. That's right.

Q. And so, you've got to depend on whatever the arresting officers or the observing officers . . . to then come in here and tell the jury whether or not you think it's therapeutic or intoxicating, correct?

A. Right.

By her cross-examination, trial counsel highlighted that Dr. Walterscheid's opinion regarding therapeutic blood level versus intoxicating blood level was dependent on the observations of Appellant's behavior by law enforcement officers and witnesses. It was not based solely on the amount of topiramate found in Appellant's blood. This acknowledgement by Walterscheid had the potential to undermine his credibility with the jury regarding his earlier testimony, on direct examination, which gave the impression that what constituted a therapeutic level and what constituted an intoxicating level was a fixed amount, based solely on the level of topiramate in a person's blood. Obtaining this testimony from Walterscheid was arguably more detrimental to the State's case than obtaining it

35

from a defense witness hired to refute Dr. Walterscheid's opinion. And it was a more effective means to let the jury know that there is no set intoxicating level for topiramate. Although the State mentioned in its closing argument that Appellant's topiramate blood level was three times the therapeutic level, defense counsel pointed out in her closing statement that Dr. Walterscheid admitted on cross-examination that there was no clear cut-off between therapeutic and intoxicating topiramate blood levels.

In addition to his concession regarding blood levels, Dr. Walterscheid also acknowledged on cross-examination that some people do not experience any side effects from topiramate. This acknowledgment from Walterscheid served to diminish the importance of his other testimony regarding topiramate blood levels. It also corresponded with Appellant's claim that his physical and mental faculties were unaffected by topiramate. It supported the defense's strategy to focus on that claim. In sum, the record does not show that Appellant was prejudiced by counsel's decision not to retain an expert to address issues relating to topiramate blood level.

### Amount of Topiramate Taken by Appellant

Appellant also avers that trial counsel should have retained an expert to assist in countering the State's assertion that Appellant had taken six topiramate tablets instead of two, as he claimed. Dr. Walterscheid testified that Appellant's

36

topiramate blood level of 13 mg\L was consistent with having ingested six topiramate tablets, the amount missing from the prescription bottle. Appellant points to Dr. Kosten's affidavit in which the doctor averred, "[Dr. Walterscheid's] calculation is likely an over-estimation of the dose taken." Dr. Kosten explained that Appellant has a "mild renal impairment leading to an increase in blood levels of this medication compared to the amount ingested." Appellant asserts that trial counsel should have retained expert assistance to show that Appellant's topiramate blood level did not necessarily correspond to ingesting six pills but could have resulted from a "false" elevation of his topiramate blood level resulting from his mild kidney impairment.

Even if counsel had presented evidence to refute Dr. Walterscheid's conclusion that his blood level indicated that Appellant had ingested 600 milligrams of topiramate, no evidence was offered to explain why the prescription bottle recovered by Officer Egdorf contained only 24 pills; that is, to show why 600 milligrams of topiramate was missing from the bottle. This alone was evidence that Appellant had taken six topiramate tablets since filling the prescription less than a day before the crash.

Appellant also asserts that trial counsel should have offered evidence to show that, despite the State's comparison of topiramate to alcohol, topiramate is not a drug that produces a "high" and does not have euphoric effect. Appellant

points out that Dr. Kosten testified that "[d]rug abusers do not like taking this medication due to its side effects and lack of pleasant properties."[7] Appellant intimates that this information would have cast doubt on the State's theory that Appellant had ingested 600 milligrams of topiramate.

With respect to the jury's determination of guilt, the issue was not whether Appellant had ingested six pills or two pills; and it was not whether Appellant had taken topiramate to get high or whether he had taken it to keep his migraines at bay. *Cf. Farmer v. State*, No. PD–1620–12, 2013 WL 5538876, at *5 (Tex. Crim. App. Oct. 9, 2013) (stating that driving while intoxicated is a strict liability crime, not requiring a specific mental state). The issue was whether he was intoxicated. Even if counsel had offered expert testimony to cast doubt on the State's theory that Appellant had taken six pills, the State presented ample evidence, as discussed above, demonstrating that Appellant was intoxicated. Thus, Appellant has failed to show that "'there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'" *See Perez*, 310 S.W.3d at 893 (quoting *Strickland*, 466 U.S. at 695, 104 S. Ct. at 2068–69).

---

[7] Appellant also points out that Dr. Kosten stated in his affidavit that ingesting a 600 milligram dose of topiramate would likely make someone nauseous and possibly vomit. Appellant testified that he vomited in a patrol car at the scene when he saw Portillo's body. Eliciting testimony from an expert that 600 milligrams of topiramate would likely cause nausea had the potential to undermine Appellant's claim that he became upset when he saw Portillo's body. Rather than assisting Appellant, such testimony may have served instead to reinforce the State's claim that Appellant had ingested 600 milligrams of topiramate.

Appellant also asserts that, even if counsel's failure to retain an expert to cast doubt on the State's claim that Appellant ingested 600 milligrams of topiramate did not affect the verdict, such failure likely affected the maximum sentence assessed by the jury. Appellant claims that, by suggesting that he intentionally overdosed on topiramate, he was made to appear more culpable than if he had been following his doctor's instructions with respect to dosage.

After reviewing the record, we disagree that there is a reasonable probability that any deficiency by counsel to retain an expert to refute the State's claim that Appellant ingested 600 milligrams of topiramate affected Appellant's sentence. As discussed, the jury heard testimony from numerous eye witnesses that, before the crash, Appellant was driving at a high rate of speed and handling his vehicle in an aggressive and erratic manner. The jury saw the scene video and observed Appellant's demeanor and seeming lack of concern for the crash victims. The jury also saw the photographs from the autopsies and the crash scene, including photographs of Portillo's head pinned between the roof and door of his truck.

During the punishment phase, the jury heard from the complainants' families that they were both good, hard-working family men, who were greatly loved and missed by their wives and children. In contrast, the jury also heard evidence that Appellant had recently tested positive at work for drug use and was admittedly a drug dealer.

Additionally, the jury learned that Appellant not only had a history of speeding and car accidents, he had previously been convicted of reckless driving. In committing that offense, Appellant had been driving 90 miles an hour and zigzagging in between lanes, facts also present in this case. The jury also learned that Appellant had previous convictions for assault, burglary of a motor vehicle, and criminal mischief. Although he apologized to the complainants' families and admitted to causing the crash, Appellant continued to deny at the punishment phase that he had been intoxicated, despite the jury's guilty verdicts.

We conclude that Appellant has not shown that he was prejudiced by counsel's alleged deficiencies; that is, he has not shown that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Perez*, 310 S.W.3d at 893 (citing *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068). Appellant has failed to meet his burden to show he received ineffective assistance of counsel. The trial court did not abuse its discretion by denying his motion for new trial.

We overrule Appellant's first issue in each appeal.

### Assessment of Court Costs

In his second issue, Appellant asserts that the evidence was not sufficient to support the trial court's assessment of $444 in court costs in the judgments.

A supplemental clerk's record has been filed, containing a certified, signed bill of costs listing $444 in court costs. We review the assessment of court costs on appeal to determine if there is a basis for the costs, not to determine whether there was sufficient evidence offered at trial to prove each cost. *See Johnson v. State*, No. PD–0193–13, 2014 WL 714736, at *2 (Tex. Crim. App. Feb. 26, 2014). Traditional sufficiency-of-the-evidence standards of review do not apply to this review. *Id.*

Generally, a bill of costs must (1) contain the items of cost, (2) be signed by the officer who charged the cost or the officer who is entitled to receive payment for the cost, and (3) be certified. *Id.* at *5; *see* TEX. CRIM. PROC. CODE ANN. arts. 103.001, 103.006 (Vernon 2006). Here, the bill of costs contained in the supplemental clerk's record identifies each item of cost, is signed by a representative of the district clerk's office, who is entitled to receive payment of the costs, and is certified. *See Johnson*, 2014 WL 714736 at *4. There being no challenge to any specific cost assessed, the bill of costs supports the assessment of the court costs in the judgments. *See id.* at *8.

We overrule Appellant's second issue in each appeal.

**Conclusion**

We affirm the judgment of the trial court in each appellate cause.


                                      Laura Carter Higley
                                      Justice

Panel consists of Justices Keyes, Higley, and Massengale.

Publish.   TEX. R. APP. P. 47.2(b).